# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

DANA LEE PRESLEY,                 )
)
      Plaintiff,           )
)      **Civil Action No. 3:13-00644**
      v.                  )      **Judge Nixon / Knowles**
)
CAROLYN W. COLVIN,          )
**Acting Commissioner of Social Security,**  )
)
      Defendant.         )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 14. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 16.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed her application for Supplemental Security Income ("SSI") on

November 24, 2009, alleging that she had been disabled since May 1, 2007, due to degenerative knee joint disease, bipolar disorder, acid reflux disease, sleep apnea, obesity, and "Barret's esophagus." *See, e.g.,* Docket No. 10, Attachment ("TR"), pp. 49, 143. Plaintiff's application was denied both initially (TR 49) and upon reconsideration (TR 50). Plaintiff subsequently requested (TR 64) and received (TR 72) a hearing. Plaintiff's hearing was conducted on April 23, 2012, by Administrative Law Judge ("ALJ") Carey Jobe. TR 28. Plaintiff and Vocational Expert, David Mark Boatner, appeared and testified. *Id.*

On April 26, 2012, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 8-22. Specifically, the ALJ made the following findings of fact:

> 1. The claimant has not engaged in substantial gainful activity since November 24, 2009, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: degenerative joint disease knees; obesity; sleep apnea; bipolar disorder; obsessive-compulsive disorder; and personality disorder (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except requires a sit/stand option at thirty-minute to one-hour intervals; can do simple, one- to three-step tasks, with minimal contact with co-workers, supervisors, and the general public (dealing primarily with things and not people); infrequent workplace changes; and no rigorous

production quotas.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on November 25, 1974, and was 34 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 24, 2009, the date the application was filed (20 CFR 416.920(g)).

TR 13-22.

Plaintiff timely filed a request for review of the hearing decision. TR 7. On April 26, 2013, the Appeals Council issued a letter declining to review the case (TR 1-4), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and

testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985)

(*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*,

---

[1] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ: (1) improperly evaluated and assessed her credibility; (2) erroneously discounted the Medical Source Statement from her treating physician, Dr. John Cain; (3) erroneously accorded little weight to the Consultative Examiner's report; (4) did not see "new and material" evidence from Dr. Gary Gallant; and (5) minimized or failed to consider the "debilitating effects" of all of her mental and physical impairments. Docket No. 14-1 at 1-2. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and

7

immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1.  Credibility of Plaintiff's Statements

Plaintiff contends that, in finding her to be less than fully credible, the ALJ did not

adequately address her subjective complaints.  Docket No. 14-1 at 12. Specifically, Plaintiff

maintains that the ALJ made a conclusory statement that he used the criteria outlined in SSR 96-

7p in reaching his decision, but that he did not state the weight he gave to Plaintiff's statements

or the rationale for that weight, as required by SSR 96-7p. *Id.* Plaintiff further argues that the ALJ

erred in discounting her credibility based on the fact that she had been able to perform some

activity on a very minimal basis, and that, "[b]y focusing on these few activities of daily living,

the ALJ ignored the medical evidence which shows that the Plaintiff is disabled." *Id.*

Defendant responds that the ALJ complied with SSR 96-7p because, throughout his

decision, he specifically explained why he found Plaintiff's subjective complaints not to be fully

credible, and because those reasons were supported by the record.  Docket No. 16 at 14.

Defendant points to numerous inconsistencies between Plaintiff's statements and medical

evidence of record, and also notes inconsistencies between Plaintiff's alleged disability onset

date and evidence in the record concerning her subsequent work history. *Id.* at 9-13. Finally,

Defendant points out that, although Plaintiff has alleged mental health impairments, Plaintiff

failed to seek mental health treatment for "long periods of time." *Id.* at 12-13.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective

complaints:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v.*

*Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause some of her symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully credible to the extent that they differed from her determined residual functional capacity. TR 19. In making this finding, the ALJ discussed Plaintiff's subjective complaints and Plaintiff's reports about her daily activities as follows:

> As for her activities of daily living, the psychological evaluation reported she was independent in her self-care, provided all the care for a four-year-old child, drives and shops without difficulty, cooks, and performs other household chores on a regular basis (Exhibit 4F, page 4). As of January 2012, the claimant was "keeping up with her activities of daily living and is able to care for her 6 year old son" (Exhibit 18F, page 3). Her Function Report confirms her role as primary caregiver for her child, caring for a pet, performing household chores but not yardwork, driving, shopping, and managing her financial affairs (Exhibit 3F, pages 1 to 4). The claimant does report some difficulty in school, though she later obtained a GED (Exhibit 10F, page 2). She also reports dislike of crowds, and testified at the hearing that she shopped only at night. Although there are some contrary notations in the medical evidence of record, such as reporting that she "sells cars" for income (Exhibit 10F, page 2) and not appearing in distress at her many medical appointments during the daytime, I will give her the benefit of the doubt and find a moderate limitation in this functional area.
>
> . . .
>
> The claimant reports problems with concentration and attention, stating her attention span is "not long" (Exhibit 3E, page 6). Such problems were not noted at the psychological evaluation, which reported that her memory was within normal limits, and her attention and concentration skills were not noticeably impaired. The claimant did report that memory problems had caused her to

lose her last job, and poor stress tolerance and limited ability to
adapt to work-related changes were felt to cause at least moderate
severity restrictions (Exhibit 4F, pages 3, 5). Unimpaired
concentration and intact memory is also reported in her mental
health treatment notes (Exhibits 2F, page 5; 10F, page 4; 18F, page
10). The claimant also reports poor tolerance for stress and dislike
of change (Exhibit 3E, page 7), and in light of the somewhat
inconsistent nature of the record as a whole, I will again give the
claimant the benefit of the doubt and find a moderate restriction in
concentration, persistence, and pace.

TR 16-17, *citing* TR 150-57, 216-49, 286-91, 383-403.

The ALJ also discussed at length Plaintiff's medical records, which include her subjective

complaints, as follows:

The claimant's medical records show complaints of right knee pain
made to a primary care physician in January 2009, diagnosed as
degenerative joint disease. Both knees were reported as hurting in
February 2009, and the claimant also asserted depression. Despite
oral medications, neither condition is reported as improved by
April 2009 (Exhibit 1F).

The claimant sought mental health treatment in May 2009,
receiving diagnoses of mood disorder not otherwise specified and
obsessive-compulsive disorder, with symptoms including
hyperactivity, easy distractibility, racing thoughts, social
withdrawal, crying spells, poor concentration, angry outbursts,
excessive worry, panic attacks, obsessive cleaning, and disturbed
sleep. Her Global Assessment of Functioning (GAF) score at
intake was recorded as 44 to 50. She reported no improvement in
May 2009 despite taking Prozac (Exhibit 2F). The claimant missed
her remaining scheduled appointments, and was dropped for
nonattendance (Exhibit 15F).

The claimant received treatment for gastrointestinal complaints
episodically from 2007 through 2009 (Exhibit 3F).

A psychological evaluation from February 2010 noted complaints
of depression, with symptoms including crying spells, inability to
get along with others, social withdrawal, anhedonia, irritability,
feelings of guilt, hopelessness, aggressive behaviors, counting

rituals, obsessive cleaning, and disturbed sleep. Her memory was within normal limits, and her attention and concentration skills were not noticeably impaired. A remote history of substance abuse was reported. She reported a lengthy criminal history and is currently on probation. She was not receiving mental health treatment. She reported losing her last job due to memory problems. The claimant reported a wide variety of activities of daily living, but significant social functioning issues were noted. Her GAF was recorded as 60 (Exhibit 4F).

A physical consultative examination from March 2010 notes a history of degenerative joint disease of both knees, sleep apnea treatment by CPAP device, and obesity, with a BMI of 44.7. She had full range of motion in all joints, tenderness to the right knee, and a positive right straight leg raise test. She walked with a slight limp. A reduced range of light residual functional capacity was proposed, with occasional lifting of twenty pounds and standing or walking for four hours of an eight-hour workday and no limits on sitting (Exhibit 5F).

Based on her mental health treatment records and the psychological evaluation, the DDS has twice found moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and proposed accommodating work-related restrictions (Exhibits 6F; 7F; 12F; 13F).

Records from her primary care physician show visits from February 2010 to April 2010 regarding knee pain with walking distances, along with more transitory complaints (Exhibit 8F).

The DDS found the claimant capable of light work (Exhibit 9F).

The claimant started treatment with a community mental health service in June 2010, when she was diagnosed with polysubstance dependence, obsessive-compulsive disorder, bipolar I disorder, and learning disorder not otherwise specified. Her substance abuse was reportedly in remission. She was listed as unemployed, but reported that she "sells cars for income." She had good concentration, depressed mood, and reported a history of violent behaviors. Her GAF on intake was recorded as 45 (Exhibit 10F).

Following her intake session, she returned in July 2010 with new issues of anxiety secondary to a custody dispute with her husband.

She reported improvement in her symptoms prior to this development. No additional treatment is reported until a psychological assessment in January 2012, when she reported increased irritability and obsessive-compulsive behaviors. She had taken no psychotropic drugs in the last year, but was able to care for her six-year-old son and manage a variety of activities of daily living. She reported no history of inpatient mental health treatment, no suicide attempts, and irritability as her primary symptom. Her GAF was recorded as 45 (Exhibit 18F).

The claimant reports treatment at a county health department in December 2010, when she reported chronic right knee pain and depression, and low back pain for the prior three months. She also reported situational anxiety, and obesity was noted. No improvement was reported at a follow-up visit in January 2011 (Exhibit 16F).

The claimant sought emergency room treatment for right foot pain and an upper respiratory infection in February 2010. Outpatient surgery on a toe was performed in June 2010. She reported a right knee injury from a fall in September 2010. X-rays were within normal limits, and she was treated for a small contusion and a ligament sprain. She returned four days later with complaints of low back pain radiating to her right leg. X-rays were within normal limits, and she was diagnosed with lumbar strain. She returned for a third time within a week, and moderate back spasms were noted. Straight leg raise tests were negative, and CT scans were within normal limits. Goiter was diagnosed in March 2011. Echocardiogram studies in March 2011 found only insignificant heart abnormalities. She returned in August 2011, reporting a left knee injury after a fall. X-rays found a questionable small joint effusion, and an immobilizer was supplied. An additional left knee injury was reported in October 2011, and she was issued crutches. The claimant was also treatment [*sic*] for a minor ear injury in December 2011 (Exhibit 17F).

The claimant reported left knee pain to an orthopedist in August 2011, described as moderate and episodic. She reported an onset four months prior "in association with work." She was diagnosed with a meniscus tear, and an MRI was ordered. She returned in March 2012 with complaints of bilateral knee pain, worsening over time, but did not get the MRI scan secondary to cost. X-rays were within normal limits (Exhibit 19F).

A medical opinion form prepared in April 2012 by the claimant's counselor and signed by her psychiatrist confirmed an initial appointment in June 2010 and a most recent visit in March 2012. Her diagnoses were listed as bipolar II disorder, obsessive-compulsive disorder, and polysubstance dependence, and her GAF was reported as 45. It was opined that she was not capable of maintaining employment (Exhibit 20F).

The claimant's mental health treatment notes show no contact in February 2012 and a cancelled appointment in March 2012. The claimant called in March 2012 requesting an increase in her medications, which was approved. Late in March 2012, the claimant reported improvement in her depression, but no change in her anxiety. She reported about three panic attacks per week and avoiding crowds. Her medications were again revised. The claimant returned in April 2012 for a "strengths assessment" and "service planning," but no treatment was provided (Exhibit 21F).

TR 13-15, *citing* 207-91, 302-19, 321-427.

As can be seen, the ALJ's decision specifically addresses in detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, indicating that these factors were considered. TR 13-17. It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461,

463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions

among the medical reports, the claimant's testimony, the claimant's daily activities, and other

evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*,

742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)).

If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the

reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons

must be supported by the record (*see King*, 742 F.2d at 975).

After assessing all of the objective and testimonial medical evidence, the ALJ ultimately

determined:

> After careful consideration of the evidence, I find that the
> claimant's medically determinable impairments could reasonably
> be expected to cause at least some of the alleged symptoms;
> however, the claimant's statements concerning the intensity,
> persistence and limiting effects of these symptoms are not credible
> to the extent they are inconsistent with the above residual
> functional capacity assessment.

TR 19.

The ALJ explained:

> In terms of the claimant's alleged physical impairments, I have
> found the severe impairments set forth above after reviewing the
> record as a whole, including the medical evidence of record. As
> noted above, while she does have some epigastric complaints, there
> is nothing in the record to indicate that these cause any significant
> work-related functional limitations, and I have found them
> nonsevere. There is even less evidence to support a diagnosis of
> fibromyalgia or chronic obstructive pulmonary disease, and while I
> cannot find these conditions as medically determinable
> impairments, I have considered her reported symptoms in the
> context of her known impairments. I start by noting that the DDS
> applied a light residual functional capacity (Exhibit 9F), while the
> consultative examiner proposed a slightly less than light residual

functional capacity (Exhibit 5F). While I give both of these opinions some weight, I found the claimant's testimony regarding knee pain generally credible, and when considered in combination with her obesity under SSRO 02-01p and possible fatigue from her sleep apnea, I find that a reduction to the sedentary exertional level is appropriate. The medical evidence of record supports her assertions of bilateral knee pain, and though there is some indication that her left knee injury occurred while lifting a heavy object at work in 2011 (Exhibit 19F, page 5), I will give her the benefit of the doubt and further reduce her residual functional capacity by adding a sit/stand option. I find that no other physical restrictions are needed to accommodate her impairments.

As for her mental health issues, I start by noting that I have found the severe impairments listed above after reviewing the entirety of the medical evidence. Although the claimant's precise diagnoses vary over time, I have considered all of her reported and observed symptoms and find that the above severe impairments adequately encompass the full range of her complaints, however they may be phrased in medical history. As noted above, while the claimant has sought medical treatment for her mental health issues on several occasions, she has yet to maintain treatment for any extended period of time. Thus, while she has received GAF scores indicative of serious symptoms on multiple occasions, these scores are all derived primarily from the claimant's assertions, which I find only partially credible. Although the claimant reports chronic depression and anxiety, her sporadic, brief attempts at treatment suggest significantly lesser severity symptoms than she alleges. She has not required inpatient treatment, and reportedly was successfully maintaining her activities of daily living and caring for a child as a single parent despite no treatment for at least a year, and was then advised to return six weeks later, a time frame that hardly indicates disabling symptoms (Exhibits 18F, pages 3, 14). The record also indicates that the claimant's symptoms are more situational than chronic, and are often related to domestic disputes. For example, in May 2009 she began treatment with a mental health service, and later that month she reported "high levels of anxiety related to her baby's father picking at her" (Exhibit 2F, page 1). She stopped attending sessions after one month of treatment and was dropped for nonattendance (Exhibit 15F). Likewise, she began treatment with another mental health service in June 2010, reporting in July 2010 that she had "new issues" over allegations of assault by her husband that were causing "extreme anxiety." She also reported

that her medications had been helping prior to these developments (Exhibit 18F, page 15). No additional treatment was received after that encounter until January 2012 (Exhibit 18F, page 3). Her lack of consistent treatment despite evidence of improvement with even minimal treatment, further supports my conclusion that the claimant has no more than moderate limitations in social functioning and concentration, persistence, and pace. The above residual functional capacity accommodates these restrictions by significantly limiting her contact with others, providing for only simple work with few workplace changes, and prohibiting rigorous production quotas. These final provisions specifically address her reported intolerance of change and dislike of stress (Exhibit 3E, page 7). I find that no other restrictions are needed to accommodate her severe mental impairments.

As for the opinion evidence, great weight has generally been given to the opinions of the claimant's treating physicians, to the reports of the medical testing, and to the reports of the State Agency's consultants, except where lesser weight was given in a particular area as noted elsewhere in this decision.

In sum, the above residual functional capacity is supported by the claimant's medical records, the residual functional capacity assessments prepared by the State Agency's consultants as modified by the claimant's subjective statements to the extent deemed credible, and my thorough review of the record as a whole.

TR 19-20, *citing* TR 150-57, 216-28, 250-52, 277-85, 321, 383-411.

As can be seen, the ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## 2. Weight Accorded to Medical Source Statement Opinion of Treating Physician, Dr. Cain

Plaintiff maintains that the ALJ erroneously discounted Dr. Cain's Medical Source Statement ("MSS") opinion that she was not capable of maintaining employment. Docket No.

14-1 at 8. Plaintiff argues that the ALJ's statement: "although signed by her psychiatrist, this form was prepared by the claimant's counselor, who is not an acceptable medical source under Social Security Ruling 06-03p," does not constitute a sufficient reason for discounting Dr. Cain's opinion. *Id.* at 9. Plaintiff contends that the form at issue was indeed from an acceptable medical source, because "Dr. Cain, a psychiatrist, signed off on the form in complete and total agreement with the form, and the preparer is irrelevant once the form was signed by an acceptable source." *Id.* Plaintiff also contends that Dr. Cain is her treating psychiatrist, and that as such, his opinion is due greater weight. *Id.* Plaintiff additionally asserts that the ALJ erroneously discounted Dr. Cain's MSS by indicating that Plaintiff's treatment at Volunteer Behavioral Health Care ("VBHC") was "sparse," when the MSS was dated April 10, 2012 and her medical records indicated that she had received treatment there dating back to June 1, 2010. *Id.* at 9-10.

Defendant responds that the ALJ properly accorded little weight to Dr. Cain's MSS opinion that Plaintiff was unable to maintain employment but could manage her own funds and live alone without supervision. Docket No. 16 at 14. In support of this assertion, Defendant points out that the form at issue was prepared by counselor Gayle Cheatham, who is not an acceptable medical source under SSR 06-03p, and only signed upon its completion by Dr. Cain. *Id.* at 15. Defendant also maintains that, given his limited contact with Plaintiff, "it is questionable" whether Dr. Cain qualifies as a treating physician. *Id.* at 15-16. Finally, Defendant maintains that the ALJ properly noted, but was not bound to accept, the GAF score referenced by Dr. Cain as the basis for his opinion, because GAF scores do not correlate to the severity requirements for Social Security disability benefits. *Id.* at 16-17.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> . . .

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[2] *See, e.g.,* 20 C.F.R. § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight. SSR 96-2p.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r*, 276 F.3d 235, 240 (6th Cir. 2002)(*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

In the case at bar, on April 10, 2012, Dr. Cain signed an MSS form, which was prepared

---

[2] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record. *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

by Counselor Cheatham, that indicated that Plaintiff was not capable of maintaining employment, but was capable of managing her own funds and living alone without supervision. TR 412.[3]  As an initial matter, Counselor Cheatham is not an "acceptable medical source" who can provide "medical opinions" as defined by the Regulations. SSR 06-03p.  Accordingly, while the ALJ should consider documents prepared by unacceptable medical sources because he must consider the evidence in its entirety, they are not entitled to the deference due evidence from acceptable medical sources.  *See, e.g.,* 20 C.F.R. § 416.927(d); 20 C.F.R. § 404.1527(d).

As Plaintiff correctly argues, although the MSS was prepared by Counselor Cheatham, it was signed by Dr. Cain, who is an acceptable medical source.  Because the MSS is signed by an acceptable medical source, the ALJ must consider it and weigh it in accordance with the Regulations.  The ALJ in the instant action did, in fact, properly consider Dr. Cain's opinion and ultimately accorded it little weight, explaining:

> In reaching these findings, I note the opinions expressed in Exhibit 20F and find them entitled to only little weight. Although signed by her psychiatrist, this form was prepared by the claimant's counselor, who is not an acceptable medical source under Social Security Ruling 06-03p. Further, because of the limited contact the claimant has had with this mental health service, it is questionable whether this can properly be called a "treating" opinion (20 CFR 416.927). In addition, it should be noted that the claimant's reported GAF score of 45 carries little weight in a disability determination. GAF scores are not based on standardized norms and admittedly provide only a snapshot impression of an individual's psychological status. Accordingly, they are neither

---

[3] That form also noted Plaintiff's diagnoses as bipolar II disorder, obsessive-compulsive disorder, and polysubstance dependence, and noted her most recent GAF score as 45.  TR 412. The form indicated that Plaintiff's initial contact had been on June 1, 2010, with her most recent visit being on March 27, 2012.  *Id.* Plaintiff's next appointment was noted as being scheduled for April 18, 2012. *Id.*  The record reflects that Dr. Cain had also treated Plaintiff on January 31, 2012. TR 383-96.

inherently reliable evaluations nor are they intended to be used as controlling evidence in a disability determination. Further, the Commissioner has previously declined to endorse the use of GAF scores in disability determinations because they are not directly correlated to the severity requirements of the Social Security Act and Regulations. Finally, the detailed observations and descriptions in a provider's notes are a vastly superior reflection of an individual's true functional abilities than a shorthand GAF score, and it is those observations upon which my decision is based. Those notes, limited as they are, indicate that the claimant had received no treatment in the past year, yet was still capable of maintaining appropriate activities of daily living and caring for a six-year-old child (Exhibit 18F, page 3). Some improvement in her mood was noted at her next visit, though her anxiety was reported as unchanged (Exhibit 21F, page 3). The claimant's medications were being adjusted during this period, and it is not uncommon for some time to pass before the full therapeutic effects of new medications are seen. This strongly suggests that the claimant has begun responding to treatment, and would reasonably be expected to continue to improve if treatment were maintained, something she has not done in the past. I also give little weight to the comment that the claimant was not capable of maintaining employment as of her most recent visit in March 2012 (Exhibit 20F). This is beyond the scope of a proper medical opinion. Opinions on employability are more properly the province of the vocational expert, and while a medical professional's conclusions might be sound, in our system of review they are entitled to no more weight than would be given to a vocational expert's medical diagnosis. Likewise, the question of a claimant's disability is a question reserved for the Commissioner, and medical opinions on such matters are merely some of the evidence to be considered before that determination is made. As is set forth in detail below, I have obtained opinion evidence from a vocational expert at the hearing, and find that it is entitled to far greater weight. While I have given consideration to this opinion, I find that it does not persuade me to conclude that the claimant is disabled.

TR 17-18, *citing* TR 383-403, 412-27.

With regard to the statement on the MSS form at issue that Plaintiff was incapable of

maintaining employment, as a preliminary matter, the ALJ is not bound by conclusory statements

of a treating physician that a claimant is disabled because the definition of disability requires consideration of both medical and vocational factors. *See, e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). Moreover, an opinion from a physician that a claimant is "unemployable" is not equivalent to an opinion that the claimant is disabled, because, as has been noted, whether a claimant is disabled for SSA purposes requires consideration of both medical and vocational factors. *See id; Casey v. Sullivan,* 987 F.2d 1230, 1234-35 (6th Cir. 1993). Additionally, because the question of disability for SSA purposes requires consideration of vocational factors, as the ALJ correctly states, the opinion that Plaintiff was incapable of maintaining employment is beyond the scope of a proper medical opinion. Rather, it must be considered within the ambits of the SSA definitions and Regulations, and is therefore a question for the Vocational Expert ("VE"). The ALJ in the instant case properly questioned the VE, and discussed the VE's testimony regarding Plaintiff's ability to work as follows:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.27. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
>
> > 1.    Table worker, sedentary, unskilled (SVP-2), a job classification employing 340 within a ninety-mile radius of Nashville, Tennessee, out of 14,300 nationally;

2.   Small parts assembler, sedentary, unskilled (SVP-2), 900/25,000; and

3.   Check weigher, sedentary, unskilled (SVP-2), 520/14,500.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the <u>Dictionary of Occupational Titles</u>, except for the consideration of the sit or stand option, which is not addressed in the DOT. That testimony is based on the vocational expert's education and field experience, and is thus a reliable source of occupational information appropriate for consideration under Social Security Ruling 00-4p.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

TR 21-22.

With regard to Plaintiff's GAF scores, as noted by the ALJ, GAF scores are not determinative of disability for Social Security purposes. In fact, the Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements in [the] mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (August 21, 2000).  Although "the GAF is a test used by mental health practitioners with respect to planning treatment and tracking the clinical progress of an individual in global terms, the ALJ is not bound to consider its results at the exclusion of other medically reliable evidence." *Alvarez v. Barhart*, 2002 WL 31466411, at *8 (W.D.Tex. October 2, 2002).  Nor is a GAF score determinative of an individual's RFC assessment. *Id.* ("A GAF score is not a rating typically relied upon with

respect to assessing an individual's RFC under the Act."); *see also Howard v. Commissioner*, 276 F.3d 235, 241 (6th Cir. 2002)(GAF score is not essential in assessing RFC). Accordingly, while the ALJ should note GAF scores as being evidence in the record, he is not bound by them.

Plaintiff also takes issue with the ALJ's characterization of her treatment at Volunteer Behavioral Health Care as being limited. Docket No. 14-1 at 9-10. The record reflects that Plaintiff was seen by various mental health professionals at Volunteer Behavior Health Care on six occasions over a nearly two year span: June 1, 1010, July 20, 2010, January 31, 2012, March 22, 2012, March 27, 2012, and April 4, 2012. *See* TR 286-91, 383-96, 397, 399-403, 413-14, 415-18, 419-21, 422-23, 424, 427.[4] The ALJ's statement was accurate, and was rendered simply

_____

[4] The ALJ summarized Plaintiff's mental health treatment as follows:

> The claimant started treatment with a community mental health service in June 2010, when she was diagnosed with polysubstance dependence, obsessive-compulsive disorder, bipolar I disorder, and learning disorder not otherwise specified. . . . Her GAF on intake was recorded as 45 (Exhibit 10F).

> Following her intake session, she returned in July 2010 with new issues of anxiety secondary to a custody dispute with her husband. She reported improvement in her symptoms prior to this development. No additional treatment is reported until a psychological assessment in January 2012, when she reported increased irritability and obsessive-compulsive behaviors. She had taken no psychotropic drugs in the last year, but was able to care for her six-year-old son and manage a variety of activities of daily living. She reported no history of inpatient mental health treatment, no suicide attempts, and irritability as her primary symptom. Her GAF was recorded as 45 (Exhibit 18F).
> . . .

> A medical opinion form prepared in April 2012 by the claimant's counselor and signed by her psychiatrist confirmed an initial appointment in June 2010 and a most recent visit in March 2012. Her diagnoses were listed as bipolar II disorder, obsessive-

as one reason why he was not according Dr. Cain's opinion greater weight. TR 17-18.

Moreover, the ALJ discussed the details of Plaintiff's treatment records from Volunteer

Behavioral Health Care, thereby demonstrating that he reviewed them and was aware of their

contents. *Id.*

Plaintiff is correct in her assertion that, if Dr. Cain had treated Plaintiff for an extensive

period of time, then that fact would justify the ALJ's according greater weight to his opinion than

to other opinions, as long as that opinion was supported by medically acceptable clinical and

laboratory diagnostic techniques, and consistent with the evidence of record. As has been noted,

however, Dr. Cain saw Plaintiff on only a few occasions, and Dr. Cain's opinion contradicts

other substantial evidence in the record, including treatment notes. TR 17.

As the Regulations state, the ALJ is not required to give controlling weight to a treating

physician's evaluation when that evaluation is inconsistent with other substantial evidence in the

record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is

---

compulsive disorder, and polysubstance dependence, and her GAF
was reported as 45. It was opined that she was not capable of
maintaining employment (Exhibit 20F).

The claimant's mental health treatment notes show no contact in
February 2012 and a cancelled appointment in March 2012. The
claimant called in March 2012 requesting an increase in her
medications, which was approved. Late in March 2012, the
claimant reported improvement in her depression, but no change in
her anxiety. She reported about three panic attacks per week and
avoiding crowds. Her medications were again revised. The
claimant returned in April 2012 for a "strengths assessment" and
"service planning," but no treatment was provided (Exhibit 21F).

TR 14-15.

contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above, and the final decision regarding the weight to be given to the opinions lies with the Commissioner. *Id.*; 20 C.F.R. § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord Dr. Cain's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

### 3. Weight Accorded to Opinion of Consultative Examiner Linda Blazina

Plaintiff argues that the ALJ erred in according little weight to opinions contained in the report of Consultative Examiner, Dr. Linda Blazina. Docket No. 14-1 at 10. Plaintiff maintains that the ALJ "apparently ignored" some of Dr. Blazina's findings, and "primarily pointed out the statements" that supported his decision. *Id.* Plaintiff references her own hearing testimony as support for the findings and credibility of Dr. Blazina, and argues that the ALJ failed to provide sufficient reasons for rejecting Dr. Blazina's stated opinions. *Id.*

Defendant responds that the ALJ was not required to give Dr. Blazina's report controlling weight because she was a consultative examiner, and a one-time consultative examination fails to "provide a detailed, longitudinal health picture." Docket No. 16 at 17. Defendant argues that the ALJ, in his RFC finding, nevertheless accounted for Dr. Blazina's diagnosis of Plaintiff's personality disorder as a severe impairment. *Id.* Defendant also argues that the ALJ was not bound to accord greater weight to Dr. Blazina's opinion because of Plaintiff's "limited mental health treatment records" and the contradictory objective and testimonial evidence of record, all of which were discussed by the ALJ. *Id.*

Dr. Blazina completed a consultative examination of Plaintiff on February 3, 2010. TR 244-49. Regarding Plaintiff's mental status, Dr. Blazina noted:

The claimant was alert and fully cooperative. She maintained fair eye contact during the interview.

Her mood was depressed. She cried at intervals and complained of crying frequently. Her affect was restricted.

Her speech was slow in rate, but fluent. She had no receptive language impairment. She had no impairment in her reality testing and no reported history of psychotic symptoms. She denied any suicidal or homicidal ideation or intent.

She stated she has been chronically depressed "to some extent" and stated she continues to feel depressed and also feels nervous, has crying spells, avoids other people, lacks interest in activities, cannot get along with others, feels irritable, and feels guilty, hopeless, and worthless. She stated she has particular difficulty getting along with her 4-year-old son's father who lives with her and she stated "a while back I tried to choke him."

She also reported other symptoms as consistent with diagnosis of obsessive-compulsive disorder stating that she has counting ritual [*sic*] in which she has to "count to the number eight all the time with everything," she has to wash her hands excessively during the day, and stated in her house everything has to be straight or she becomes very upset.

She was oriented to x4. Memory function appears to be within normal limits. She recalled recent activities without difficulty and recalled her history without difficulty. She recalled three of three words after five minutes and correctly chose the third word when provided with a categorical prompt. Her attention and concentration skills were not noticeably impaired. She was able to remain focused on the conversation. She spelled the word world forward and backwards correctly. She was able to complete six serial 7s subtractions. Her intellectual functioning was estimated to be within the low average range with vocabulary consistent with intellectual functioning. Her abstracting abilities are adequate. She stated that the proverb don't count your chickens before they hatch means "don't get excited before it happens." Her general fund of information was average. She correctly named the president, the shape of a ball, and the colors of the American flag.

She described a history of cocaine dependence stating that she used

cocaine for approximately two years ending six years ago and she stated "I have been clean for six years."  She reportedly did not use any other drugs or alcohol.  She did not report any substance abuse treatment.

She stated that last year she was seen at LifeCare Center on an outpatient basis for counseling and medication, but she is not currently receiving mental health treatment, although, she stated she desires to do so and was encouraged to seek further outpatient mental health intervention for treatment of her depression and other symptoms.

TR 245-46.

Regarding Plaintiff's activities of daily living and functional abilities, Dr. Blazina noted:

The claimant stated that she is able to complete her self-care skills without any assistance and does so regularly.  She also reports that she is able to care for her 4-year-old son without any assistance.

She stated she has a driver's license and is able to drive without any problem.

She also reported that she is able to shop for groceries and other necessary items without any difficulty.

She stated that at home she engages in normal household chores on a regular basis and stated she has to keep her house straightened up and spends generally 1 to 2 hours a day doing household chores. She stated also she knows how to cook and generally will cook meal [*sic*] three times weekly and does not require any assistance with cooking "unless I am in severe pain."

She stated that she does not have any close friends, but does see her parents on a fairly regular basis.

She states she is able to manage her own money and pays her own bills.

Her interests were reported as enjoying watching television, using her computer, and spending time with her son.

She stated on an average day that she will get up and then get her

29

> son off to school, then goes home and feeds her dogs, cleans house,
> picks up her son from school in the afternoon, then they watch
> television and she uses her computer, she feeds her son dinner, take
> a bath and gets his bath and then they go to bed. She described a
> good day as "very little pain and I don't cry much." She describes
> a bad day as "I cry all day for no reason and I am in pain."

TR 246-47.

Upon completion of the examination, Dr. Blazina opined regarding Plaintiff's mental

abilities to engage in work-related activities:

> The claimant's ability to understand and remember does not appear
> to be impaired. Her ability to maintain concentration and attention
> does not appear impaired at this time. Her social interaction
> abilities are felt to be severely impaired due to characterological
> issues, poor impulse control, and her acknowledged history of
> violence with a history of incarceration. Her ability to adapt to
> changes in a work routine and tolerate normal workplace stress is
> likely moderately to severely impaired due to her depression, poor
> impulse control, and poor stress tolerance.

TR 248.

The ALJ discussed Dr. Blazina's examination and findings and their relation to the record

as follows:

> A psychological evaluation from February 2010 noted complaints
> of depression, with symptoms including crying spells, inability to
> get along with others, social withdrawal, anhedonia, irritability,
> feelings of guilt, hopelessness, aggressive behaviors, counting
> rituals, obsessive cleaning, and disturbed sleep. Her memory was
> within normal limits, and her attention and concentration skills
> were not noticeably impaired. A remote history of substance abuse
> was reported. She reported a lengthy criminal history and is
> currently on probation. She was not receiving mental health
> treatment. She reported losing her last job due to memory
> problems. The claimant reported a wide variety of activities of
> daily living, but significant social functioning issues were noted.
> Her GAF was recorded as 60 (Exhibit 4F).
> . . .

30

As for her activities of daily living, the psychological evaluation reported she was independent in her self-care, provided all the care for a four-year-old child, drives and shops without difficulty, cooks, and performs other household chores on a regular basis (Exhibit 4F, page 4). As of January 2012, the claimant was "keeping up with her activities of daily living and is able to care for her 6 year old son" (Exhibit 18F, page 3). Her Function Report confirms her role as primary caregiver for her child, caring for a pet, performing household chores but not yardwork, driving, shopping, and managing her financial affairs (Exhibit 3E, pages 1 to 4). The claimant does report some difficulty in school, though she later obtained a GED (Exhibit 10F, page 2). She reports dislike of crowds, and testified at the hearing that she shopped only at night. Although there are some contrary notations in the medical evidence of record, such as reporting that she "sells cars" for income (Exhibit 10F, page 2) and not appearing in distress at her many medical appointments during the daytime, I will give her the benefit of the doubt and find a moderate limitation in this functional area.

Regarding her social functioning skills, the record more clearly reflects significant difficulties. Although she reports frequently talking on the phone, she also notes intermittent difficulty dealing with others and poor relations with authority figures (Exhibit 3E, pages 5 to 7). The psychological evaluation noted poor impulse control, a history of violence including an incarceration for "affiliation to first-degree attempted murder," loss of custody of six of her seven children, and an erratic work history, which was characterized as a severe impairment in her social interaction abilities (Exhibit 4F). The DDS interpreted the evidence as supporting a moderate limitation in social functioning (Exhibits 6F, page 11; 12F, page 11), noting that the claimant has reported much of her more extreme behavior occurred during the period of her former drug abuse (Exhibit 10F, page 3). Because the claimant has maintained sobriety for an extended period, I find that her prior substance abuse is not related to the decision on disability, though her sobriety does support limiting her degree of restriction during the period at issue to the moderate range of severity. I also note that the consultative examiner reported the claimant's GAF score as 60, a level inconsistent with symptoms above the moderate range of severity, further suggesting that more severe findings should be limited to her less stable youth.

> The claimant reports problems with concentration and attention, stating her attention span is "not long" (Exhibit 3E, page6). Such problems [with concentration and attention] were not noted at the psychological evaluation, which reported that her memory was within normal limits, and her attention and concentration skills were not noticeably impaired. The claimant did report that memory problems had caused her to lose her last job, and poor stress tolerance and limited ability to adapt to work-related changes were felt to cause at least moderate severity restrictions (Exhibit 4F, pages 3, 5). Unimpaired concentration and intact memory is also reported in her mental health treatment notes (Exhibits 2F, page 5; 10F, page 4; 18F, page 10). The claimant also reports poor tolerance for stress and dislike of change (Exhibit 3E, page 7), and in light of the somewhat inconsistent nature of the record as a whole, I will again give the claimant the benefit of the doubt and find a moderate restriction in concentration, persistence, and pace.

TR 13-14, 16-17, *citing* TR 150-57, 216-28, 244-49, 253-66, 286-91, 302-15, 383-403.

As a preliminary matter, the ALJ was not required to give Dr. Blazina's report controlling weight because she was a one-time consultative examiner, and the opinion of a consulting physician is not entitled to the deference due the opinion of a treating physician. *Barker v. Shalala*, 40 F. 3d 789, 794 (6th Cir. 1994). Additionally, as discussed above, the ALJ is not bound to accept an opinion when that opinion contradicts other evidence of record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the physician's opinion is weighed against the contradictory evidence under the criteria listed above, and the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. *Id.*, 20 C.F.R. § 416.927(e)(2).

As is demonstrated above, the ALJ considered Dr. Blazina's evaluation, accepted the parts he found consistent with, and supported by, the evidence, and discounted the parts that were based upon Plaintiff's subjective reports or were inconsistent with, or unsupported by, the

evidence of record. The ALJ's consideration of Dr. Blazina's opinion was proper. Accordingly, Plaintiff's argument fails.

### 4. New and Material Evidence

Plaintiff argues that the ALJ did not have before him the updated records from treating provider, Dr. Gary Gallant (TR 428-47), which detail many of Plaintiff's ailments and which constitute "new and material" evidence, such that "the case should be remanded for proper consideration" of that evidence. Docket No. 14-1 at 11.

Defendant responds that the records do not qualify as new evidence because the records at issue cover the period of September 9, 2010 to June 6, 2011, and therefore pre-date both the April 23, 2012, administrative hearing and the April 26, 2012, ALJ decision. Docket No. 16 at 18. Defendant also argues that Plaintiff has proffered no "good cause" (or any explanation at all) for why this evidence was not acquired and presented at the hearing. *Id.* Defendant additionally maintains that there is no "reasonable probability" that the ALJ would have reached a different decision had these records been before him, because the records disclose no significant change in Plaintiff's medical condition. *Id.* at 19. Finally, Defendant argues that where the Appeals Council reviews newly submitted evidence, but declines to review the claimant's application on the merits, the district court cannot consider this new evidence in its review of the ALJ's decision. *Id.*, *citing Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

The evidence at issue is 2010-2011 medical records from Dr. Gary Gallant. TR 429-47. Plaintiff attached these records with the brief sent to the Appeals Council. TR 5. These materials were received by the Appeals Council on April 26, 2013. *Id.* The Regulations provide that where new and material evidence is submitted with the request for review, the entire record will be

evaluated and review granted where the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence. 20 C.F.R. § 416.1470. After reviewing Dr. Gallant's records and the record as a whole, the Appeals Council determined that there was no basis under the Regulations for granting Plaintiff's review. TR 1-3. The Appeals Council explicitly stated that:

> We also considered the records from Dr. Gary D. Gallant dated February 10, 2010 to June 6, 2011 (27 pages). These documents are not new because they are exact copies of records contained in Exhibits 11F and 22F.

TR 2.

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

As an initial matter, Plaintiff cannot establish that Dr. Gallant's medical records are new. The records at issue date from 2010 and 2011, prior to Plaintiff's 2012 hearing or the ALJ's 2012 decision. Plaintiff proffers no explanation for failing to submit the records at issue to the ALJ. Accordingly, Plaintiff has not established "good cause" for failing to submit Dr. Gallant's records to the ALJ.

Additionally, Plaintiff cannot establish that Dr. Gallant's medical records are material. "In order for the claimant to satisfy her burden of proof as to materiality, she must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*,

865 F.2d 709, 711 (6th Cir. 1988), *citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980). Plaintiff has failed to satisfy this burden. Exhibit 11F (TR 292-301), which was considered by the ALJ, contains Dr. Gallant's records through April 16, 2010, and Plaintiff makes no argument regarding how specifically Dr. Gallant's remaining 2010 and 2011 records would have affected the ALJ's decision. Docket No. 14-1 at 11. In fact, the ailments noted by Dr. Gallant in the records at issue, including Plaintiff's knee pain, degenerative joint disease, foot pain, back pain, heart problems, and goiter, were discussed by the ALJ throughout his decision. TR 13-15. The ALJ was also aware of Plaintiff's Hepatitis C, since Plaintiff testified about her condition and its effects at her hearing. TR 38-39. Because the ALJ was aware of the same ailments that were contained in Dr. Gallant's 2010 and 2011 records, there is no reasonable likelihood that the ALJ would have reached a different decision had Dr. Gallant's 2010 and 2011 records been before him.

Plaintiff has failed to demonstrate that Dr. Gallant's 2010 and 2011 records were either new or material, and Plaintiff has failed to establish that there was good cause for her failure to present the evidence at her hearing. Accordingly, remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is not warranted.

### 5. Consideration of All Impairments

Plaintiff argues that the ALJ erred in failing to consider all of her physical and mental impairments, and in failing to provide sufficient reasoning as to why he found some of her impairments to be nonsevere. Docket No. 14-1 at 14-17. Specifically, Plaintiff contends that, although she has been diagnosed with physical impairments of Hepatitis C, anemia,

chondromalacia of the right knee,[5] and "right foot and back disorder," the ALJ did not consider

these impairments to be severe and did not explain his rationale for failing to so find. *Id.* at 14-

16. Plaintiff further asserts that the ALJ erred in minimizing the effects of her mental

impairments, including, *inter alia*, anxiety and panic attacks, continued depression, tearful

episodes, continued irritability, anger, insomnia, racing thoughts, mood disorder, OCD, and

bipolar disorder. *Id.* at 16-17.

Defendant responds that the ALJ considered all of the impairments alleged by Plaintiff.

Docket No. 16 at 19. Defendant asserts that the ALJ is not required to discuss every piece of

evidence in his decision. *Id.*, *citing Walker v. Sec'y of Health & Human Services*, 844 F.2d 241,

245 (6th Cir. 1989). Defendant additionally asserts that the mere diagnosis of the conditions listed

by Plaintiff does not say anything about the intensity of those conditions, and that Plaintiff bears

the burden of establishing the seriousness of her alleged impairments. *Id.* at 20. Defendant argues

that Plaintiff's medical records indicate that these impairments do not have the "debilitating

effects" alleged by Plaintiff. *Id.* at 20-21.

As an initial matter, an impairment can be considered nonsevere only if it is so slight that

it could not result in a finding of disability, no matter how adverse a claimant's vocational factors

might be. *See, e.g.*, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Salmi v. Secretary of

H.H.S.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th

Cir.1985). When an ALJ finds that a claimant has at least one severe impairment and proceeds

to complete the sequential evaluation process, however, the ALJ's failure to find that another

---

[5] In addition to being diagnosed with right knee condromalacia, Plaintiff also contends that she has "medial meniscus tear - left knee" and "degenerative joint disease in her knees." Docket No. 14-1 at 15.

condition is a severe impairment cannot constitute reversible error. *See Maziarz v. Secretary*, 837

F.2d 240, 244 (6th Cir. 1987).

In the case at bar, the ALJ found that Plaintiff had the following severe impairments:

degenerative joint disease in her knees, obesity, sleep apnea, bipolar disorder, obsessive-

compulsive disorder, and personality disorder. TR 13. Because the ALJ found that Plaintiff had

at least one severe impairment and proceeded to complete the sequential evaluation process, any

alleged failure of the ALJ to find other impairments severe cannot constitute grounds for

reversal. *Maziarz*, 837 F.2d at 244. Accordingly, Plaintiff cannot prevail on this ground.

Moreover, the ALJ explicitly explained his rationale for finding some of Plaintiff's

impairments to be severe and others to be nonsevere. TR 15. Specifically, the ALJ stated as

follows:

> The impairments identified above are established by the medical
> evidence and are "severe" within the meaning of the Regulations
> because they cause significant limitation in the claimant's ability to
> perform basic work activities. The other conditions mentioned in
> the claimant's medical records but not identified above as severe
> impairments are nonsevere, as they have all either resolved with no
> credible allegations of continued limitation to the claimant's
> activities, or the limitations produced are either minor or
> infrequent. This includes her complaints of gastroesophageal reflux
> disease and Barrett's esophagus.

TR 15.

Further, the ALJ was aware of or discussed each of the ailments listed by Plaintiff and the

limitations these ailments imposed on Plaintiff's functioning. TR 13-15. With regard to

Plaintiff's Hepatitis C, as noted in the statement of error above, the ALJ was aware of Plaintiff's

condition since she testified as such in the hearing. TR 38-39. With regard to Plaintiff's anemia,

the ALJ discussed the records of Tennessee Sports Medicine, wherein the impression of anemia was noted. TR 15, *referencing* TR 404-11. As can be seen in the ALJ's decision, the ALJ extensively discussed Plaintiff's knee problems, back problems, and foot problems. TR 13-15, *citing* TR 207-15, 250-52, 271-76, 322-82, 404-11. The ALJ also discussed Plaintiff's mental impairments, specifically mentioning her depression, OCD, racing thoughts, crying spells, panic attacks, insomnia, anger, bipolar disorder, and mood disorder. TR 13-15, *citing* TR 216-28, 244-49, 286-91, 322-27, 383-403, 412-27.

As can be seen, the ALJ properly considered all of Plaintiff's mental and physical impairments. The ALJ's alleged failure to find some of these conditions to be a severe impairment cannot constitute reversible error, because the ALJ found that Plaintiff had at least one severe impairment (he found six severe impairments, in fact, *see* TR 13), and he proceeded to complete the sequential evaluation process. *See Maziarz v. Secretary*, 837 F.2d 240, 244 (6th Cir. 1987) Accordingly, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of

service of this Report and Recommendation can constitute a waiver of further appeal of this

Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985),

*reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


E. CLIFTON KNOWLES
United States Magistrate Judge